NORTON and others *v.* EUROPEAN & N. A. RY. and others.

(*Circuit Court, D. Maine.* November 8, 1887.)

COURTS—FEDERAL JURISDICTION—CITIZENSHIP—REAL PARTIES IN INTEREST.

F. P., a citizen of Maine, being involved in litigation with a railroad corporation of that state, got control of a large number of its second mortgage bonds by agreeing with the holders to stand the expense of all litigation necessary for their collection, half of what was realized to go to the holders, and, if nothing came of the matter, the bonds to be returned. N., a Massachusetts lawyer, engaged to carry on the suit in his own name on a contingent fee of 50 per cent. if a certain number of the bonds were secured and assigned to him in form, out and out, but really as collateral. F. P. negotiated the purchase of the small number required to make up the necessary amount in the name of his brother, E. P., also a citizen of Massachusetts. The bonds were then all transferred to E. P. absolutely, and he and F. P. closed the indicated arrangement with N. The suit, which was a bill to redeem from the foreclosure of the first mortgage, was brought in Maine in N.'s name, and E. P. subsequently intervened. Pending the suit, E. P., with the consent of his brother, who had in the mean time sold some of the bonds, assumed all liability for future expenses, and settled with N. by a *bona fide* transfer of part of the bonds. *Held,* that F. P. was the real party in interest, the transfers

from him being colorable merely, within the meaning of the act of March 3, 1875, and that the suit should be dismissed, the actual plaintiff and the de fendant being both residents of Maine.

In Equity.

*Wm. L. Putnam, C. P. Stetson,* and *Drummond & Drummond,* for respondents.

*W. F. Lunt, Alexander McMichal,* and *H. D. Hadlock,* for Marcus P. Norton.

*Warren & Brandeis,* for E. B. Pillsbury.

COLT, J. This suit is brought by Marcus P. Norton on behalf of himself and of all other bondholders of the Consolidated European & North American Railway, to redeem the portion of its railroad and property lying within the state of Maine from a foreclosure under a trust deed executed by the European & North American Railway. The European & North American Railway was duly organized under the laws of the state of Maine in 1850, for the purpose of constructing a railroad from the city of Bangor to the eastern boundary of the state, to connect there with a road to be constructed to St. Johns, New Brunswick. For the purpose of raising funds, the company on March 1, 1869, executed a deed of trust of all its property to J. Edgar Thompson and Hannibal Hamlin, to secure an issue of $2,000,000 of its bonds. The property covered by this instrument included the lands which had been granted to the company by the state of Maine.

The New Brunswick Company was organized as a corporation under the laws of the province of New Brunswick in 1864. From the opening of the road for traffic in 1871, until the latter part of 1872, each company operated separately the railroad owned by it. Then by agreement the roads were consolidated under the name of the Consolidated European & North American Railway Company. On December 5, 1872, the consolidated company executed a deed of trust of all its property to Benjamin E. Smith and Samuel F. Hersey, trustees, as a security for a proposed issue of $6,000,000 of bonds. The deed provided that $5,000,-000 of the bonds should be set apart for the redemption of the bonds issued by the two companies before their consolidation, and that the remaining $1,000,000 should be used by the consolidated company for equipment and improvement of the road, and to pay the floating debt. None of the $5,000,000 of bonds were issued, but the remaining $1,000,-000 were duly issued and sold or pledged by the consolidated company. The consolidated company failed in June, 1875, and the interest on its bonds was defaulted. In October, 1875, Benjamin E. Smith, surviving trustee for the holders of these bonds, took possession of the company and operated the railroad. On October 2, 1876, Smith surrendered possession of the road to Hannibal Hamlin and William B. Hayford, trustees under the prior mortgage; Hayford having been appointed trustee on the death of J. Edgar Thompson. These trustees remained in possession until October, 1880, when the bondholders under this mortgage claiming that the foreclosure was perfected under the state

statute, a new corporation was organized, and assumed the name of the European & North American Railway, and operated the road until September, 1882, when it was leased to the Maine Central Railroad. In November, 1882, this suit was brought by Marcus P. Norton, a citizen of Massachusetts, on behalf of himself and other bondholders of the consolidated company, against the Consolidated European & North American Railway Company, the European & North American Railway, Hannibal Hamlin and William B. Hayford, trustees, the Maine Central Railroad Company, Edward Cushing, trustee, and Noah Woods, citizens of Maine, and Benjamin E. Smith, trustee, a citizen of Ohio.

The bill prays (1) that the lease to the Maine Central Railroad Company be set aside; (2) that the organization of the European & North American Railway be declared null and void; (3) that the complainant, on behalf of himself and other bondholders of the consolidated company, be allowed to redeem the property from the pretended foreclosure by Hannibal Hamlin and Hayford; and for incidental relief.

The complainant Norton alleges, as a reason for bringing the suit in his own name, that Smith has so conducted himself in the administration of the trust as to make a request upon him both nugatory and dangerous, and that Edward Cushing, his co-trustee, though duly requested to institute proceedings, has declined to do so, or to allow his name to be used for the purpose.

On December 17, 1883, after the cause was at issue, but before any testimony had been taken, Edward B. Pillsbury, a citizen of Massachusetts, was permitted to intervene and become a party complainant. Pillsbury claims to be the owner of a large number of the bonds of the consolidated company, and he has deposited 125 bonds in court. He contends that the consolidated company are entitled to redeem from the foreclosure of Hamlin and Hayford, trustees, on two grounds: (1) Because the statutory provisions for the foreclosure of railroad mortgages which were pursued by the trustees are inapplicable to the deed of trust under which they acted, and hence the proceedings are void; (2) because even if the foreclosure proceedings were regular and lawful, still in equity they are not binding upon the bondholders of the consolidated company by reason of the collusion between Benjamin E. Smith, trustee, and Hamlin and Hayford, trustees.

The bill was taken *pro confesso* as against the consolidated company, Edward Cushing and Benjamin E. Smith. The other respondents deny that the provisions of the Maine statute were inapplicable; deny the alleged collusion between Smith, trustee, and Hamlin and Hayford, trustees; deny the validity of the consolidation of the Maine and New Brunswick companies, and of the mortgage of the consolidated company; deny that Smith's conduct has been such as to dispense with the necessity of applying to him before commencing proceedings. They further assert that the complainants have been guilty of laches, and they question the right of complainants to bring this suit.

The first question that arises upon the state of facts disclosed by the evidence is whether this court has jurisdiction to entertain this suit.

The complainant Norton alleges in the bill that he has purchased for a valuable consideration, and now owns, 400 consolidated bonds. Edward B. Pillsbury alleges in his petition that at the time of the institution of this suit he was the owner of 125 of these bonds. Let us examine the evidence in support of these allegations. F. A. H. Pillsbury, an elder brother of Edward, was, in June, 1875, a member of the firm of Haynes & Pillsbury, hardware merchants of Bangor, Maine. At this time the consolidated company owed the firm $3,000 for railway supplies, and in the early part of 1877 they brought suit against the company and attached certain rolling stock. Subsequently Hamlin and Hayford, trustees, replevied part of the stock, and brought suit against the sheriff for the balance of the property not replevied. Smith, the trustee of the consolidated company, also brought suit against the sheriff for this stock. These last suits were likewise defended by Pillsbury. He testifies that he commenced, under the advice of his counsel in the replevin suits, to buy the bonds of the consolidated company in February, 1878. The first contract for the purchase of bonds appears to have been made February 20, 1878, and is as follows:

"Whereas, John J. Haley is the owner of one hundred and eighty-nine bonds of the Consolidated European & North American Railway Company, of one thousand dollars each; and whereas, a suit in equity is pending at Bangor, in the state of Maine, from which it is supposed that the holders of the bonds of said consolidated company may derive some portion of the amount due thereon; and whereas, James H. Haynes and Frederick A. Pillsbury, partners, under the firm name of Haynes & Pillsbury, propose to purchase and hold a large number of said bonds, and to endeavor to collect the same; and whereas, they have purchased said bonds of said Haley in the manner and for the purposes hereinafter set forth, and have paid him the sum of one thousand dollars: now, therefore, the said Haynes & Pillsbury, in consideration of the premises, further agree with said Haley as follows, viz.: They will make every reasonable effort to procure the payment of the bonds of said consolidated railroad company in said suit, or by other proceedings in court or otherwise, and they will employ Henry W. Paine, or other equally good counsel, to prosecute such suits, and will pay all the expenses of such suits or other proceedings, so that no part thereof shall be chargeable to said Haley; and out of the first proceeds of such suits or other proceedings, or negotiations applicable to the payment of bonds of said consolidated railroad, held or owned by said Haynes & Pillsbury, they hereby covenant and agree to pay said Haley the further sum of six thousand ($6,000) dollars, if said proceeds shall amount to so much, or if not then they agree to pay to said Haley the whole of said proceeds; meaning to give to said Haley the right to six thousand dollars, in preference to any other claims upon proceeds of all bonds of said Consolidated European & North American Railway Company, held or owned by said Haynes & Pillsbury. If said Haynes & Pillsbury fail to collect anything on account of said consolidated railroad bonds, then the said one hundred and eighty-nine bonds are to be returned to said Haley, unless it shall have been necessary, in the reasonable and proper prosecution of such suits or other proceedings for the collection of such bonds, to put said one hundred and eighty-nine bonds beyond the control of said Haynes & Pillsbury. If the said Haynes & Pillsbury shall negligently or willfully fail to prosecute such suits and proceedings for the collection of said bonds, then the said one hundred and eighty-nine bonds are to be returned to said Haley, except as provided in the foregoing paragraph, and said Haynes & Pillsbury are also to pay to said Haley the sum

of twenty-five hundred dollars, as liquidated damages for their breach of this agreement, and not as a penalty.

"And we, J. O. B. Darling and I. S. Johnson, of Bangor, Penobscot county, Maine, for the consideration aforesaid, and in consideration of one dollar to us paid by said Haley, do hereby join in this agreement as sureties for the faithful performance thereof by said Haynes & Pillsbury.

"Witness our hands and seals this twentieth day of February, A. D. 1878.

[Signed] "HAYNES & PILLSBURY,
"J. O. B. BAILEY,
"I. S. JOHNSON."

Another contract was made February 19, 1879, of the following tenor:

"Whereas, James Murray Kay, of St. John, N. B., is the representative of the owners of two hundred and fifty (250) Consolidated European & North American Railway Mortgage Bonds of one thousand ($1,000) dollars each; and whereas, Haynes, Pillsbury & Co., of Bangor, Me., have this day purchased of said James Murray Kay the said two hundred and fifty (250) Consolidated E. & N. A. Ry. Bonds (schedule of the numbers of which are below) in the manner and for the purpose hereinafter set forth, and have this day paid said Kay the sum of two hundred and fifty (250) dollars for the same: Now, therefore, the said Haynes, Pillsbury & Co., in consideration of the premises, further agree with the said Kay as follows: Haynes, Pillsbury & Co. to use their best efforts and employ the best of counsel to collect upon said bonds, by suit or other proceedings in court, and of the amount so collected thereon one-half of the same to be paid by them to said Kay; said Kay not to be a party to the record, or his name in any way to be publicly connected with the matter, nor responsible therefor. And we, J. O. B. Darling and I. S. Johnson, of Bangor, Me., do hereby jointly and severally join in this agreement, as sureties for the payment to said Kay of the money collected as above stated.

"*Bangor, Me., February* 19, 1879.

"Signed, sealed, and delivered in presence of

| | |
|---|---|
| "T. W. VOSE to H. P. & Co. | HAYNES, PILLSBURY & Co. |
| "HENRY R. SNOW to J. O. B. D. | I. S. JOHNSON. |
| "WM. E. HOWARD to I. S. J. | J. O. B. DARLING." |

"BANGOR, ME., February 19, 1879.

"*J. Murray Kay*—SIR: (In sale, $250,000 Consolidated E. & N. A. Ry. Mortgage Bonds.) Referring to the agreement made with you this day in the above matter, we desire hereby to state that, in explanation and in amplification of the wording of said mentioned agreement, we thereby and hereby undertake to hold you individually, and as agent for your principals, harmless from all loss, damage, or expense in any way which may, directly or indirectly, arise out of the aforesaid mentioned agreement, to-wit, as to or from legal proceedings hitherto made and taken, or which may be undertaken, in regard to the foreclosure, or other steps taken in recovering under the said mortgage of which the above referred to bonds form part.

"Yrs., faithfully, HAYNES, PILLSBURY & Co."

The other bonds acquired by F. A. H. Pillsbury were under agreements of similar character, except the purchase of 40 bonds from one Burrell. These bonds, (exclusive of the Burrell purchase,) 700 in number, were retained by him until the summer of 1882. In April, 1882, through negotiations carried on by him, his brother Edward, who now intervenes in this suit, acquired 50 bonds of the Imperial Bank of London, under the following contract:

"Whereas, the Imperial Bank (Limited) of London, England, being the owner of fifty (50) Consolidated E. & N. A. Ry. Mort. Bonds of ($1,000) one thousand dollars each; and whereas, Edward B. Pillsbury, of Boston, Mass., U. S. A., has this day purchased of said Imperial Bank (Limited) of London, England, the said fifty (50) Consolidated E. &. N. A. Ry. Mortgage Bonds (of the numbers per schedule attached below in the manner and for the purposes hereinafter set forth,) and has this day paid said Imperial Bank (Limited) of London, England, the sum of fifty dollars for the same: Now, therefore, the said E. B. Pillsbury, in consideration of the premises, further agrees with the said Imperial Bank as follows: Said Pillsbury to use his best efforts, and employ the best of counsel, to collect upon said bonds, by suit or other proceedings, in court or otherwise; and of the gross amount so collected thereon, one-half of the same to be paid by him to said Imperial Bank, said Imperial Bank not to be a party to the record, or its name in any way to be connected with the matter, nor responsible therefor. And we, Haynes, Pillsbury & Co., of Bangor, Me., Edward Cushing, of Camden, Me., and I. S. Johnson, of Bangor, Me., do hereby jointly and severally join in this agreement as parties for the payment to said Imperial Bank (Limited) of the money collected as above stated.

"*Boston, Mass., April 24,* 1882.

"The words 'Limited' and 'gross' interlined before signing.

"Signed, sealed, and delivered in presence of

"W. M. Smith to                   Edward B. Pillsbury.
"W. B. Ayer to                    Haynes, Pillsbury & Co.
"W. B. Ayer to                    Edward Cushing.
"C. L. Batchelder to              I. S. Johnson.

"Schedule of numbers of said bonds as follows: 951 to 1,000, inclusive, with coupons attached.                          Edw. B. Pillsbury."

It will be observed that this agreement is similar to the one F. A. H. Pillsbury made with Kay. It was about this time that the complainant Norton appears upon the scene. Edward B. Pillsbury testifies:

"About the first of June, 1882, I learned from Haynes & Pillsbury that Marcus P. Norton, now one of the plaintiffs in these causes, had made a proposition to them that he would undertake, at his own expense, to bring suits on the consolidated bonds, provided they would deposit 750 or 800 of the bonds in Boston, as a basis of such suits. They did not possess that number, and proposed to me that I pool my 50 bonds with theirs, which should all be deposited in Boston, and an agreement made with Norton as above outlined. I assented, and we stood ready to make such an agreement and arrangement. Norton was dilatory in the matter, and nothing further was done by me until the latter part of July, when F. A. H. Pillsbury began preparations to remove permanently to California for domestic and other reasons. Haynes & Pillsbury offered to sell all their bonds to me at what I considered a reasonable sum, and on reasonable terms, so that I might, if possible, make an arrangement with Norton. And this proposition I accepted. It should be understood that neither Haynes & Pillsbury nor myself possessed a sufficient number of bonds to make an independent arrangement with Norton on the terms he required."

In order that the proposition made by Norton might be carried out, F. A. H. Pillsbury sold to his brother 700 bonds, under the following agreement:

"Boston, Mass., July 29, 1882.

"For and in consideration of seven hundred (700) Consolidated E. & N. A. Ry. Co. mortgage bonds of $1,000 each, with coupons attached, delivered and

sold to me this day by and through F. A. H. Pillsbury, of Bangor, Me., I hereby promise and agree to pay to him the sum of one thousand ($1,000) dollars, within six months from date, with interest. For value received.

"EDWARD B. PILLSBURY."

Indorsed as follows:

"Pay to Haynes & Pillsbury.　　　　　　　　　F. A. H. PILLSBURY.

"February 1, 1883. Rec'd two hundred (200) dollars on the within."

"BOSTON, July 29, 1882.

"*To Haynes & Pillsbury, Bangor, Me.:* Referring to the seven hundred (700) Consolidated E. & N. A. Ry. Co. mortgage bonds of $1,000 each, purchased of you this day, by and with my note of this date, on six months, for ($1,000) one thousand dollars, I hereby further promise and agree, in consideration of the premises, to assume and pay, and do hereby assume and agree to pay, any and all expenses, salaries, etc., now due and incurred or hereafter incurred in the premises of the trusteeship (of said bonds) of co-trustee Cushing, of Camden, Maine, and of his authorized agents, Haynes & Pillsbury, of Bangor, Me., so soon as I shall be in funds from and by the successful termination of any suit or suits on said bonds, or otherwise.

"EDWARD B. PILLSBURY."

Indorsed as follows:

"November 4, '82. Rec'd two thousand (2,000) dollars from E. B. Pillsbury, to be paid and applied as within stated, for him, in part liquidation of his within agreement.

"February 1, 1883. Rec'd eight hundred (800) dollars from E. B. Pillsbury, for the purposes within stated, and to be paid and applied therefor, for him, in part liquidation of his within agreement."

The following is the agreement with Norton which led to the transfer of the 700 bonds from F. A. H. Pillsbury to his brother:

"MEMORANDUM PROPOSITION.

"BOSTON, MASS., June 5, 1882.

"In the matter of the Consolidated European & North American Railway Company's ' Bonds,' issued under and by the authority of the act of the legislature of the state of Maine, and by the act of the legislature of the dominion of Canada, consolidated into one and a new company, (the old company known as the ' Maine Company,' also that known as the ' Brunswick Company,') I am willing, and I will undertake, at my own expense, in the money required, in carrying on any suit or suits, also for the services of proper counsel, say General B. F. Butler and Hon. B. Wadleigh, of Boston, to enforce payment of the said consolidated bonds, in full, including interest due, or that may be due, if there be sufficient property for that purpose, contained in that property named in the mortgage, by which said bonds are secured in Maine or [New] Brunswick; and for said expenses, labor, professional services for myself, also for said counsel, and all other necessary expenses requiring the payment of money, will accept one-half of said bonds in case at least $750,000 or $800,-000 thereof shall be set apart for payment as aforesaid, and will make no other or further charge for said expenses and professional work of myself or other said counsel. Said business to go into operation in the courts, if necessary, at once, or as soon thereafter as the arrangement shall be made, and the same shall be pushed ahead without delay, as fast as the courts will allow the same to be done; of course all papers relating to the matter here to be furnished me if in the power of the other party so to do. No compromise to be entered into unless all the parties hereto agree to the same and in writing. Said bonds to be held in the vaults of a responsible safe deposit company in Boston, and not

to be delivered to either party until the same shall be agreed upon in writing under the agreement. In case *nothing is recovered by the suit or other pro-ceedings* by said Norton, all of said bonds to be delivered to said Pillsbury.

 · [Signed]                                    "MARCUS P. NORTON.

 *"Dated this fifth day of June,* 1882."

·Subsequently, just before Norton brought this suit, which was begun November 20, 1882, this additional agreement was entered into:

"This article of an agreement made on this seventh day of November, A. D. 1882, by and between Marcus P. Norton, trustee, of the city of Boston, in the commonwealth of Massachusetts, party of the first part, and Fred. A. H. Pillsbury, of the city of Bangor, in the state of Maine, and his brother Edward B. Pillsbury, of said city of Boston, party of the second part, witnesseth: that whereas, on the fifth day of June, A. D. 1882, and at said city of Boston, the said Marcus P. Norton, trustee, and said Fred. A. H. Pillsbury, made and entered into a memorandum agreement in writing, dated on or about the said fifth day of June, A. D. 1882, a copy of which is hereto annexed, marked 'A,' and made a part hereof, while each of said persons hold an original in *dupli-cate;* now, therefore, in consideration of the sum of one dollar paid to and re-ceived to the full satisfaction of said Norton, trustee, and said Pillsbury, and in further and other valuable considerations herein and hereby duly acknowl-edged by the parties hereto, the following is now and here made addition to said memorandum agreement in writing, that is to say:

"The said Fred. A. H. Pillsbury, and his brother Edward B. Pillsbury, and the said Norton, trustee, have this seventh day of November, A. D. 1882, duly ·deposited in a safe in the vault of ' The Security Safe Vaults,' Equitable Build-ing, corner of Milk and Devonshire streets, in the said city of Boston, for the rental of which the said Norton, trustee, holds a receipt of the company own-ing said ' Security Safe Vaults,' dated Boston, November 6, 1882, (750) seven hundred and fifty bonds of the Consolidated European & North American Railway Company of ($1,000) one thousand dollars each, with coupons at-tached, and which are the first mortgage bonds of said railway company, and duly issued and delivered by said company as by law provided at the time of the date thereof, reference to which is hereby had for a more full description of the same and of each thereof.

"The said Marcus P. Norton, trustee, is now preparing and is to bring and institute one, two, or more suits, if the same, in his judgment, shall become necessary, in order to carry out the said contract and agreement, using his name in the manner and form affixed hereto, in any of the courts of the United States of America having jurisdiction to enforce and compel the pay-ment of said bonds and coupons thereto attached; and he, the said Marcus P. Norton, trustee, for himself, trustee, his heirs and lawful representatives, have agreed in said ' Memorandum Agreement ' of the date aforesaid, and also now and hereby agree and contract, to commence, carry on, and to pros-ecute any and all of said suits to be so commenced on said bonds for their pay-ment, together with all the coupons thereon, to a final decision and deter-mination and conclusion in the said courts, and as speedily and vigorously as is possible for him and his attorneys, and of counsel under his instruction, to do, in the exercise of good faith and sound discretion and judgment to exer-cise,—all of which is to be done at his own cost and expense, and of his said heirs and lawful representatives, in case of his decease before the finishing of said suit or suits, as the case may be; good counsel being employed by him for said suits, etc., and at his own expense as aforesaid, the same being also mentioned in said agreement of June 5, A. D. 1882.

"The said Marcus P. Norton, trustee aforesaid, has paid for, and he is to continue to pay for, the use of said safe in said deposit vaults, No. 1,328, for

the safe-keeping of each of said bonds during the pendency of said suit or suits, as the case may be.

"Except only for 'conditions broken' on the part of said Norton, trustee, the said (750) seven hundred and fifty bonds herein mentioned are to remain and continue to remain in said safe No. 1,328 until the final completion of and final adjustment of said suit or suits, as the case may be, unless upon the mutual consent of said Marcus P. Norton, trustee, by order in writing, and of the said Fred. A. H. Pillsbury and his said brother Edward B. Pillsbury, by order in writing, duly obtained and given in the presence of one or more witnesses.

"Upon the completion of said suit or suits, one-half ($\frac{1}{2}$) of the gross sum or amount adjudged, declared, or decreed as belonging to said (750) seven hundred and fifty bonds and coupons, or otherwise recovered on the same, is to be paid to said Pillsbury and his said brother, or their written order, and one-half ($\frac{1}{2}$) of the gross sum or amount so adjudged, declared, or decreed, of said bonds and coupons, is to be paid to said Marcus P. Norton, trustee, or his written order, as herein contracted and agreed to.

"If nothing shall be thus recovered in said suit or suits, and upon completion and termination thereof by said Norton, trustee, or his heirs or legal representatives in case of his decease, all of said bonds and coupons are to be delivered to said Pillsbury and his said brother, or their written order, without claim or any hindrance thereafter.

"For and only upon hereinbefore stated 'conditions broken,' it is hereby agreed by said Marcus P. Norton, trustee, that immediately thereafter the said Fred. A. H. Pillsbury and his said brother shall be entitled to have and to know the combination of said safe No. 1,328, so as to enable said bonds, under said supposed circumstances, to be at once delivered to said Pillsbury and his said brother, together with said coupons, otherwise said bonds and coupons are to remain as herein provided; and at the final termination of any and all suits mentioned herein, if successful, on the part and in behalf of the said Marcus P. Norton, trustee, or any one lawfully representing him, then the said bonds and coupons are at once to be divided by and between the said parties hereto in the manner herein provided.

"The foregoing articles of agreement are, on the day first above written, to-wit, this seventh day of November, A. D. 1882, made, signed, sealed, executed, and delivered to the parties herein named, respectively, in duplicate, and upon comparison by Mr. Fred. A. H. Pillsbury, one of the parties hereto, and Joseph P. Day, in the office of said Marcus P. Norton.

"In testimony whereof we have on this seventh day of November, A. D. 1882, hereto set our hands and seals, in the presence of two witnesses, namely:

> "MARCUS P. NORTON, Trustee.        [Seal.]
> "FRED. A. H. PILLSBURY.            [Seal.]
> "EDWARD B. PILLSBURY.             [Seal.]

"JAMES H. RICE.
"LEWIS C. LILLIE."

On December 17, 1883, Edward B. Pillsbury petitioned to be allowed to join as plaintiff in this suit, which was granted. On January 3, 1884, Norton released to Edward B. Pillsbury all interest in said bonds, except in 100, of which he took possession that day; and Pillsbury, with the assent of his brother, released to Norton all interest in said 100 bonds, and agreed, among other things, to pay all expenses which shall hereafter be incurred in the prosecution of the Norton suits. It further appears that several sales of the bonds in the possession of Edward B. Pillsbury took place to outside parties, beginning November 4, 1882. These

sales were negotiated by F. A. H. Pillsbury, and the money in the first instance was paid over to him, and the indorsements on his brother's note of $1,000 were made by him. Such are the leading facts bearing upon the standing of the complainant Norton, and the subsequent complainant Pillsbury, in this case.

From a careful reading of the whole evidence, and especially that of a documentary character, I am satisfied that the principal if not the only real party in interest in this suit is F. A. H. Pillsbury, a citizen of the state of Maine; and that the transfer of bonds to his brother, and the agreements with Norton, were made for the purpose of giving this court jurisdiction over the controversy. At the time of the foreclosure proceedings under the so-called land grant mortgage, which it is now sought to set aside, neither the elder Pillsbury nor his brother nor Norton were the owner of a single bond of the consolidated company. It was the indebtedness of the consolidated company to the firm of Haynes & Pillsbury, and the lawsuits which resulted, that led to the purchase of these bonds by the elder Pillsbury. Having acquired a large number of the bonds, the next step was to bring suit. It is evident that the elder Pillsbury did not wish to bring suit in the state court, because he could have done so at any time in his own name, but, manifestly desiring to try the case in the federal courts, he plans accordingly. His brother Edward was a young man about 25 years of age, residing in Boston, in the employ of the Bankers' & Merchants' Telegraph Company, at a salary of $1,200 a year, and with no property, as he testifies, except some household goods and a few hundred dollars. Marcus P. Norton was a lawyer residing in Boston, and interested in railroad matters. It was through these instrumentalities that the elder Pillsbury hoped to carry on a successful litigation in the federal courts. Whatever apparent transfers or agreements were made respecting these bonds, it will be observed throughout these transactions that everything seems to emanate from and to be controlled by the elder Pillsbury. He purchased all the bonds, except the 50 bought by his brother from the Imperial Bank, the sale of which he negotiated. It was owing to information received from him about a proposition from Norton that Edward B. Pillsbury had an interview with Norton, which resulted in the agreement of June 5, 1882, in which, for a consideration of one-half of at least 750,000 bonds, Norton agreed to carry on suits at his own expense. This was followed July 29, 1882, by a transfer of 700 bonds from him to his brother upon his giving a note for $1,000 and the agreement attached thereto. After this so-called sale, he was still one of the principal parties in the Norton agreement of November 7, 1882. Subsequent sales of bonds to third parties appear to have been made by him, and he seems to have had the disposition of the proceeds, and he has always taken the most active interest in the prosecution of this suit. He was bound by his contract with his vendors to account to them for at least one-half of what was realized from these bonds, as the result of suits to be brought, but this he could not do if the transfer to his brother was valid. Further, the testimony of Edward B. Pillsbury, that in consideration of his becoming a

party to the arrangement with Norton, Haynes and Pillsbury should furnish the whole consideration to Norton from their bonds, is inconsistent with the fact of a sale of these same bonds to him.

From the whole evidence, I am forced to the conclusion that the real party in interest in respect to these 700 bonds is F. A. H. Pillsbury, that the sale to his brother Edward was not *bona fide,* and that this pretended transfer and the agreements with Norton were the means employed through which Norton might bring suit in this court. Whatever interest Norton had at the beginning of this suit in the bonds deposited under his agreement was derived from F. A. H. Pillsbury, a resident of Maine, and was obtained by collusion between F. A. H. Pillsbury and himself, assisted by Edward B. Pillsbury, for the purpose of giving jurisdiction to this court; and therefore under the act of March 3, 1875, (18 St. 470,) this court is without jurisdiction, and the bill should be dismissed. *Farmington* v. *Pillsbury,* 114 U. S. 138, 5 Sup. Ct. Rep. 807.

But it is said that E. B. Pillsbury was the *bona fide* owner of 50 bonds purchased from the Imperial Bank of London before the commencement of this suit, that 40 of these bonds have been deposited in court, and that, therefore, the court should entertain jurisdiction as to him. It was through F. A. H. Pillsbury that these bonds were purchased in April, 1882, about the time negotiations began with Norton. The contract E. B. Pillsbury made with the bank was like those his brother had made with Kay and others. Considering this, and the condition and position of the younger Pillsbury in this whole matter, I cannot but suspect that the real party in interest in this transaction was F. A. H. Pillsbury, whatever form the transaction may assume on paper.

But admitting that E. B. Pillsbury owns these bonds, the question arises whether this court should allow him to intervene more than a year after a suit was brought which was collusive in its origin, and which the statute declares must be dismissed, because the transfer to the complainant was colorable merely, and made for the purpose of giving this court jurisdiction, while the real party in interest was a citizen of the same state with the defendants. Under these circumstances I do not think this court should retain this bill, because a subsequent intervenor may have a standing here. A bill in equity may be amended by the addition of a new party as plaintiff, when the new party is a necessary party to the case made by the bill; but this is quite different from the allowance of an amendment making a new party to the bill, and at the same time making a new case for such party in the bill. Pillsbury comes in to assist in the prosecution of the original bill; but if the original bill ought to be dismissed, it is difficult to see on what ground to base his right to intervene. Further, Norton is still a complainant in this suit with Pillsbury. And we now have joined together in the same bill two complainants, over one of whom the court has jurisdiction, while over the other it has none, because Norton really stands in this suit for F. A. H. Pillsbury, a resident of Maine. We think this court may well say that the condition of parties is the same in this case as if F. A. H. Pillsbury were actually before the court in place of Norton, and that, therefore, the rule

should be applied which was first laid down by Chief Justice MARSHALL in *New Orleans* v. *Winter*, 1 Wheat. 91, and recently in *Iron Co.* v. *Stone*, 121 U. S. 631, 7 Sup. Ct. Rep. 1010, and the case dismissed for want of jurisdiction.